# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

JAMES HAMRAC and STEPHANIE
HAMRAC, husband and wife, and
as natural parents and guardians of
J.H., a minor,

       Plaintiffs,

       v.                             Case No. 3:09cv390/RV/MD

DOREL JUVENILE GROUP, INC.,

       Defendant.

_____/

## ORDER

       Now pending is the defendant's motion for summary judgment (doc. 19). The plaintiffs have filed a response in opposition.

## I. Background

       Unless otherwise noted, the following facts appear to be undisputed. Prior to leaving for church in the morning of Sunday, April 6, 2003, James Hamrac placed his three-year old son, J.H., into a car seat manufactured by the defendant, Dorel Juvenile Group, Inc. ("Dorel"). Mr. Hamrac correctly latched the shoulder harness and properly secured J.H. to the seat. Mr. Hamrac and J.H. were later stopped at a traffic light when their vehicle was hit in the rear and pushed into the car in front of them. Photographs of their vehicle reveal that the impact was severe, and the front and rear of the vehicle were crushed. The collision allegedly caused the locking mechanism on the car seat to malfunction and the chest clip to break, which, in turn, allowed the harness straps to come off J.H. As a result of the impact, J.H. came completely out of the car seat and hit his head on the back of the front passenger seat, after which he began to cry and crawl toward Mr. Hamrac. They were both transported from the accident scene by ambulance. Stephanie Hamrac (Mr. Hamrac's wife and J.H.'s mother) joined them at the hospital.

While at the hospital, J.H. had a few scrapes, scratches, and a "large bump" on his forehead, and he complained that his head hurt. However, he was otherwise "acting normally," and X–rays and CT-testing were negative.[1] J.H. was discharged later that same day with a final diagnosis of a closed head injury, and the Hamracs were instructed to follow-up with his regular pediatrician within the next week. Mr. Hamrac has acknowledged that the point of following-up with the pediatrician was to have him determine whether and to what extent J.H. had sustained any injuries, "particularly with the head." A week or so after the accident, Mrs. Hamrac took J.H. to his pediatrician, Dr. Philip Dean, but it appears that Dr. Dean did not focus on the head injury. Rather, he "looked him over" and "just listened to his breathing, listened to his heart, checked out his arms and legs, and had him move around --- move his limbs and general stuff like that," and he apparently found no injuries. Dr. Dean did not order (and Mrs. Hamrac did not request) further testing or evaluation of the closed head injury.[2]

---

[1] There is uncertainty as to whether the hospital was able to complete the X-rays and CT-testing. Mrs. Hamrac testified during deposition that J.H. was "frantic and upset" throughout the testing and the medical staff had a hard time keeping him still, which she felt might have prevented them from getting a "good reading." However, according to the medical records themselves (which were quoted to Mrs. Hamrac during her deposition, but are not made part of the record here), the tests were apparently completed and the results were negative.

[2] The Hamracs deny that they were told of the closed head injury. However, the diagnosis was prominently noted --- in all capital letters --- on the "Discharge Instructions Receipt," which Mrs. Hamrac signed. Notably, the discharge receipt was short, straightforward, and unambiguous (approximately 70-words and less than one page long). Mr. and Mrs. Hamrac are thus presumed to have known of the diagnosis and treatment instructions. Compare University of Miami v. Bogorff, 583 S.2d 1000, 1004 (Fla. 1991) (knowledge of medical records imputed to parents of minor child) with Tetstone v. Adams, 373 So.2d 362, 363 (Fla. 1st DCA 1979) (knowledge not imputed, however, where the records "contained many technical medical terms" and the plaintiff's condition "was effectively buried in the records").

By letter dated two days after the accident, Mr. Hamrac was advised by his insurance company that in order to make a claim with it he had to identify all bodily injuries within one year. Within two weeks after the accident --- no later than April 20, 2003 --- the Hamracs "knew that [J.H.] had injured his head in the accident," but they "just didn't know the extent of the injury." They inspected the car seat, discovered that its chest clip was broken, and determined at that time that the broken clip caused J.H.'s injury. Within six months to one year after the accident, Mr. and Mrs. Hamrac retained an attorney to recover from the insurance company for injuries that were sustained in the accident. The attorney eventually recovered $50,000 for J.H.'s injuries. For one year after the accident, the Hamracs intended to notify Dorel about the allegedly defective chest clip, but they did not do so.

For more than a year <u>before</u> the accident, J.H. had bad mood swings, was aggressive, and had a bad temper. Dr. Dean believed during this time that part of J.H.'s problems were related to Attention Deficit Disorder ("ADD") or Attention Deficit Hyperactivity Disorder ("ADHD"). The problems continued right up until the accident, and they seemed to worsen thereafter. They were described as "worse" in Dr. Dean's records in June 26, 2003, two and a half months after the accident. In addition to his mood swings, aggressiveness, and temper problems, over the course of the next year J.H. began to experience panic attacks, night terrors, and "zoning out." The Hamracs had assumed it was a naturally-progressive worsening of his existing problems. Eventually, as the problems continued to get worse, J.H. was referred to several specialists: Dr. Pickens, a pediatrician specializing in ADD (in late 2004); Dr. Simpkins (in August 2005); Jennifer Jackson, an occupational therapist (in October 2005); and Dr. Suhrbier, a pediatric neurologist (in November 2005). On January 30, 2006, Dr. Suhrbier concluded that J.H. had a brain injury, which the plaintiffs allege was the result of the traumatic blow to his head during the accident.

Several years later, on July 1, 2009, Mr. and Mrs. Hamrac brought an action against Dorel and two other defendants in the Circuit Court in and for Escambia County, Florida, alleging, in relevant part, products liability, negligence, and breach of warranty for the allegedly defective car seat. Dorel removed the case to federal court on the basis of diversity jurisdiction, after which the other defendants were dismissed from the action. Dorel then moved for summary judgment, and plaintiffs filed their response in opposition. The plaintiffs also filed a consent motion to stay the case pending resolution of Dorel's motion since "both parties recognize that, if the Court were to grant the motion for summary judgment, the case would be at a conclusion." I granted the motion to stay pending a ruling on summary judgment.

## II. Standard of Review

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(c); accord Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 807 (11th Cir. 2010). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); accord Equity Investment Partners, LP v. Lenz. 594 F.3d 1338, 1345 (11th Cir. 2010).

Summary judgment is inappropriate "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact." Allen v. Board of Public Educ. for Bibb County, 495 F.3d 1306, 1315 (11th Cir. 2007). An issue of fact will be "material" if it might affect the outcome of the case under the governing law. See Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). It is "genuine" if the record, taken as a whole, could lead a rational trier of fact to find in favor of the non-moving party. Id. On summary judgment, the record evidence and all reasonable inferences drawn therefrom must be viewed in a light most favorable to the non-moving party. Reeves, supra, 594 F.3d at 807; National Fire Ins. Co. of Hartford v. Fortune Construction Co., 320 F.3d 1260, 1267 (11th Cir. 2003). Thus, all factual disputes that are supported by "sufficient, competent evidence" must resolved in favor of the non-movant. See Pace v. Capobianco, 283 F.3d 1275, 1276 (11th Cir. 2002).

## III. Discussion

The single issue raised in Dorel's motion for summary judgment is whether the plaintiffs' complaint is barred by the statute of limitations. The parties agree that under the law of Florida (which applies to this diversity case), the applicable statute of limitation is four years. See Fla. Stat. § 95.11(3). The parties disagree, however, on when that time period began to run in this case.

Dorel contends that the limitations period began to run on the date of the accident, April 6, 2003; therefore, because this case was not filed until July 1, 2009 (more than two years after the statute of limitations expired), the claim is time-barred. The plaintiffs, however, rely on the "delayed discovery" rule, which provides that the limitations period for certain cases only begins to run "from the date that the facts giving rise to the cause of action were discovered, or should have been discovered with the exercise of due diligence. . . ." See Fla. Stat. § 95.031(2)(b); see also Hearndon v. Graham, 767 So.2d 1179, 1184 (Fla. 2000). The plaintiffs claim that the facts giving rise to this case were only discovered when Dr. Suhrbier formally diagnosed the brain injury. Prior to that diagnosis, the only injuries that they reasonably thought J.H. sustained in the accident were the few scrapes, scratches, and bump on his forehead. They allege that his increased

behavioral problems were understandably believed to be a natural worsening of his ADD and ADHD, which were thought to be unrelated to the accident until the brain injury diagnosis indicated otherwise. The plaintiffs thus contend that the case was timely on July 1, 2009, because the claim did not accrue until January 30, 2006, when they received the brain injury diagnosis and learned of the "exact injury" that serves as the basis of their claim.[3]

Under Florida law, "the long-standing rule generally applicable to personal injury claims [is that] 'the cause of action accrues and the statute begins to run from the time when the injury was first inflicted, and not from the time when the full extent of the damages sustained have been ascertained.'" Larson & Larson, P.A. v. TSE Indus., Inc., 22 So.3d 36, 42 (Fla. 2009) (citations omitted); accord Cristiani v. City of Sarasota, 65 So.2d 878 (Fla. 1953) (statute of limitation runs from notice of the negligent act rather than notice of its full consequences). The delayed discovery rule will delay commencement of the statute of limitations only in certain limited cases because in "the vast majority of cases, the action accrues when [an] event giving rise to damage occurs. Examples are: when the trespass occurs on land, when a contract is breached or repudiated, or when the collision occurs in an auto accident." Hearndon, supra, 767 So.2d at 1185 n.3 (emphasis

---

[3] In making this argument, the plaintiffs contend, inter alia, that their claim could not have arisen on the day of the accident or shortly thereafter because the only injury claim at that time would have been "the few scratches and bruises on J.H.'s body and forehead along with a bump on his forehead;" and because those injuries "cleared up right away," they would not have satisfied the permanency threshold of Florida's no-fault statute. However, since this litigation is a products liability action against Dorel (and not against the driver of the other car), Florida's no-fault statute does not apply. And even if the statute did apply, the argument is not supported by Florida law. See, e.g., Carter v. Cross, 373 So.2d 81 (Fla. 3d DCA 1979) (cause of action accrues and statute of limitations begins to run when the injury is sustained, and "this result is not changed by the fact that at the time the injury was first inflicted, the plaintiff had not reached the no-fault threshold").

added); <u>accord</u> <u>Carter v. Lowe's Home Centers, Inc.</u>, 954 So.2d 734, 735 (Fla. 1ˢᵗ
DCA 2007) (delayed discovery rule is "reserved to those cases where the plaintiff
cannot readily discover the injury done to him"; dismissing case because "nothing
prevented Carter from discovering that he slipped and fell and that he might have
been injured as a result thereof").

The plaintiffs' argument that the limitations period did not begin to run until
Dr. Suhrbier conclusively diagnosed J.H.'s brain injury falls short of what Florida's
law requires. For example, in <u>Kolnick v. Fountainview Ass'n, Inc. No. 2</u>, 737 So.2d
1192 (Fla. 3d DCA 1999), the plaintiff filed an action for personal injuries caused
by mold and mildew growth in his apartment. He argued, as the plaintiffs do here,
that although he knew that he was injured as a result of defendant's actions on a
particular date, his claim did not accrue until he later received a medical diagnosis
with respect to "how severe" his condition was. In rejecting this argument (and
affirming summary judgment on statute of limitations grounds), the Third District
Court of Appeal held:

> In <u>Carter v. Cross</u>, 373 So.2d 81 (Fla. 3d DCA 1979),
> this Court held that an action for personal injury accrues
> and the statute of limitation begins to run against the
> injured party from the time the injury was first inflicted,
> not from the time the full extent of such injuries has been
> ascertained. <u>See</u> <u>id.</u> at 82 (citing <u>Seaboard Air Line R.R.
> Co. v. Ford</u>, 92 So.2d 160, 164 (Fla. 1955)). <u>The fact
> that the full extent or "severity" of Kolnick's illness was
> not allegedly discovered by Kolnick until August 26,
> 1993, when he . . . went to a doctor and received a
> diagnosis concerning his allergies, does not change this
> result</u>. <u>See</u> <u>id.</u> at 83.

To the extent that the plaintiffs suggest that a different result is warranted
because this is a products liability case, the argument is unavailing. In <u>University of
Miami v. Bogorff</u>, 583 So.2d 1000 (Fla. 1991), also a products liability case, the
Supreme Court of Florida explained that "the knowledge required to commence the

limitation period does not rise to that of legal certainty." <u>See</u> <u>id.</u> at 1004. Rather,
plaintiffs "need only have notice, through the exercise of reasonable diligence, of
the <u>possible</u> invasion of their legal rights." <u>Id.</u> (emphasis added).The court noted
three factors that bear on the issue of when a plaintiff has (or should have through
due diligence) notice of a possible invasion of his rights: (1) awareness of an injury
or "dramatic change" in the plaintiff's condition; (2) knowledge that plaintiff was in
contact with the product at issue; and (3) constructive knowledge that the product
may have contributed to the injury. <u>See</u> <u>id.</u> The <u>Bogorff</u> holding has been explained
and restated this way:

> We interpret the test which the supreme court has
> fashioned here as having two essential ingredients: an
> injury distinct in some way from conditions naturally to
> be expected from plaintiff's condition, <u>and</u> . . . exposure
> to the product in question. Use of the conjunction "and"
> in this equation necessarily implies that the connection
> must be to some extent causal. There could be no
> "invasion of their legal rights" unless this were so.

<u>Babush v. American Home Products Corp.</u>, 589 So.2d 1379, 1381 (Fla. 4th DCA
1991). Citing <u>Babush</u> on this point, the plaintiffs interpret the case to mean that:
"In other words, the plaintiff must know about the <u>exact injury</u> that is the basis of
the injury claim and know that the injury may have been caused by the product in
question" (emphasis original). However, this is not the law. As noted, even in the
context of products liability cases, "Florida law does not require that Plaintiff know
the full extent of his injury. Plaintiff need only have notice of the possible invasion
of his legal rights" discoverable "upon the exercise of due diligence." <u>Doe v. Cutter
Biological</u>, 813 F. Supp. 1547, 1555 (M.D. Fla. 1993); <u>see</u> <u>also</u> <u>id.</u> ("The fact that
Plaintiff did not test positive for AIDS until 1990 is not dispositive because under
Florida law, the statute of limitations begins to run even if the full consequences of
the injury are not known").

The analysis of one of our sister Florida federal District Courts, <u>Samson v.</u> <u>R.J. Reynolds Tobacco Co.</u>, 1997 WL 373475 (M.D. Fla. 1997), is instructive. On February 28, 1996, the plaintiff in that case filed a products liability action against a tobacco company for personal injuries caused by his smoking, namely, Chronic Obstructive Pulmonary Disease ("COPD"). The defendant later moved for summary judgment on statute of limitations grounds. The plaintiff argued in response that he had not been "medically diagnosed" with COPD until March 31, 1992 (even though he had some breathing problems before he received that diagnosis and had reason to believe the problems might be related to smoking). The plaintiff claimed that his February 1996 complaint was timely because "the 'diagnosis' was the triggering event" that started the statute of limitations running. <u>Id.</u> at *5. After citing to and discussing several of the cases cited above, the district court rejected the argument and held there was no support in the law of Florida for the view "that the <u>diagnosis</u> of COPD is the triggering event." <u>See</u> <u>id.</u> (emphasis original). The court explained that knowledge of the exact injury and causation "<u>does</u> <u>not</u> have to be of a legal certainty. Plaintiff need not know the full extent of his injury." <u>See</u> <u>id.</u> (emphasis original). In short, "[t]he fact that Plaintiff may not have been medically diagnosed with [COPD] until March of 1992 . . . is irrelevant. Such knowledge is not required under Florida law." <u>See</u> <u>id.</u> at *6. Florida case law fully supports this conclusion.

Upon close and careful review of the pleadings and other pertinent materials on file, and consistent with the case law cited above, I find that there is no genuine issue of material fact and that summary judgment is appropriate. Because this case ultimately arises out of a car accident, I believe the complaint properly falls within the "vast majority of cases" where the cause of action first accrues at the time of the event giving rise to it. <u>See</u> <u>generally</u> <u>Hearndon</u>, <u>supra</u>, 767 So.2d at 1185 n.3. Further, even if I were to apply the delayed discovery rule, the case would still be untimely. On <u>April 6, 2003</u>, J.H. was involved in the accident, as a result of which

he was diagnosed with a closed head injury. The plaintiffs were told at the time to follow-up with his pediatrician to determine the extent of that or any other injury "particularly with the head." By no later than <u>April 20, 2003</u>, the plaintiffs have acknowledged that they knew "Jacob had suffered head trauma as a result of the car accident," but they "just didn't know the extent of the injury." Eventually, the plaintiffs recovered $50,000 for that injury. Also by no later than <u>April 20, 2003</u>, the Hamracs had inspected the car seat, discovered that the chest clip was broken, and determined at that time that the broken clip caused J.H.'s injury. As early as <u>June 26, 2003</u> (two and a half months after the accident), J.H.'s existing behavioral problems were already described as getting "worse," and by <u>late 2004</u>, plaintiffs had sought out additional medical opinions for his worsening condition, which included, <u>inter alia</u>, increased bad temper, sleeping problems, and "zoning out." Even though X–ray and CT-testing at the hospital were reportedly negative, even though Dr. Dean later performed a general physical examination and did not find anything wrong with J.H., and even though his scratches and bump eventually healed, in light of his closed head injury diagnosis and the manifested symptoms, I find that the plaintiffs had, or with exercise of reasonable diligence should have had, knowledge of a "possible invasion" of J.H.'s rights by no later than late 2004. As one district court has explained:

> A closed-head injury is the name for an <u>injury to the brain</u> essentially resulting in damage to the cellular structure of that organ. The injury is caused by the brain tissue being violently moved within the restrictive confines of the skull. This injury can occur as a result of the head striking an object or the head and neck being jerked rapidly forward and backward. [An] auto accident is the classic type of accident which causes this type of injury. <u>Because the damage to the brain is at the cellular level, imaging studies (such as MRI and CAT) do not reveal the damage</u>. . . . The symptoms of this injury include <u>marked personality change, usually for the worse; marked</u>

> <u>irritability</u>; development of "organic," rather than
> functional, depression that extends well beyond normal
> depression; <u>sleep problems</u>; [and] <u>difficulties with</u>
> <u>attention and concentration (such as when several</u>
> <u>minutes pass by without the patient being aware of what</u>
> <u>is going on</u>).

<u>Bieck v. Allied Mut. Ins. Co.</u>, 859 F. Supp. 381, 382 (D. Neb. 1994) (emphasis

added).

In sum, <u>by no later than late 2004</u> the plaintiffs knew: that J.H. had been

involved in an automobile accident; that as a consequence he was diagnosed with

a closed head injury (even though they "just didn't know the extent of the injury");

that his injury was specifically caused or aggravated by the allegedly defective car

seat; and that his behavioral and other problems were getting worse and warranted

seeking out opinions from several specialists. Based on these undisputed facts, it is

apparent that by that time, the facts giving rise to the claim were discoverable with

the exercise of due diligence. Because the case was filed on July 1, 2009, there is

no genuine issue of material fact that the cause of action accrued more than four

years before the filing of the complaint, and that summary judgment is appropriate

as a matter of law.

## IV. Conclusion

The stay previously entered in this case is hereby LIFTED and Dorel's motion

for summary judgment (doc. 19) must be, and is, GRANTED. The Clerk is directed

to enter judgment in favor of the defendant, together with taxable costs, and close

this case.

DONE and ORDERED this 11th day of May, 2010.


/s/ Roger Vinson
ROGER VINSON
Senior United States District Judge